# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

REBECCA FAGIN,
O/B/O/ B.P.,
      Plaintiff

        vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant

Case No. 1:10-cv-813
Dlott, J.
Litkovitz, M.J.

**REPORT AND**
**RECOMMENDATION**

Rebecca Fagin, on behalf of her son B.P., brings this action pursuant to 42 U.S.C. §

405(g) for judicial review of the final decision of the Commissioner of Social Security

(Commissioner) denying plaintiff's application for children's Supplemental Security Income

(SSI) disability benefits. This matter is before the Court on plaintiff's Statement of Errors (Doc.

9), the Commissioner's response in opposition (Doc. 12), and plaintiff's reply memorandum.

(Doc. 16).

## I. Procedural Background

Plaintiff filed an application for SSI in September 2006 alleging disability due to asthma;

a history of sub-mucosal cleft palate leading to Eustachian tube dysfunction, recurrent ear

infections, and conductive hearing loss; Attention Deficit Hyperactivity Disorder (ADHD);

Oppositional Defiant Disorder (ODD); and chronic allergies and allergic rhinitis. Plaintiff's

application was denied initially and upon reconsideration. Plaintiff, through counsel, requested

and was granted a de novo hearing before Administrative Law Judge (ALJ) James W. Sherry.

Plaintiff and his mother appeared and testified at the ALJ hearing. On September 23, 2009, the

ALJ issued a decision denying plaintiff's SSI application. Plaintiff's request for review by the

Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Medical and Academic Evidence

The pertinent medical and academic findings and opinions have been adequately summarized by the parties in their briefs (Doc. 9 at 2-14; Doc. 12 at 2-4) and will not be repeated here. Where applicable, the Court shall identify the evidence relevant to its decision.

## III. Analysis

### A. Legal Framework for Children's SSI Disability Determination

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual under the age of 18 is considered disabled for purposes of SSI "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of children's SSI benefits:

1. Is the child engaged in any substantial gainful activity? If so, benefits are denied.

2. Does the child have a medically severe impairment or combination of impairments? If not, benefits are denied.

3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix 1 of 20 C.F.R. pt. 404, subpt. P. 20 C.F.R. § 416.924(a)? If so, benefits are granted.

20 C.F.R. § 416.924(a)-(d). An impairment which meets or medically equals the severity of a set

of criteria for an impairment in the Listings, or which functionally equals a listed impairment,

causes marked and severe functional limitations. 20 C.F.R. § 416.924(d).

In determining whether a child's impairment(s) functionally equal the Listings, the

adjudicator must assess the child's functioning in six domains:

1. Acquiring and using information;

2. Attending and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for yourself; and

6. Heath and physical-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi). To functionally equal an impairment in the Listings, an

impairment must result in "marked" limitations in two domains of functioning or an "extreme"

limitation in one domain. 20 C.F.R. § 416.926a(d). The relevant factors that will be considered

in making this evaluation are (1) how well the child initiates and sustains activities, how much

extra help he needs, and the effects of structured or supportive settings; (2) how the child

functions in school; and (3) how the child is affected by his medications or other treatment. 20

C.F.R. § 416.926a(a)(1)-(3).

An individual has a "marked" limitation when the impairment "interferes seriously with

[the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §

416.926a(e)(2)(i). A "marked" limitation is one that is "more than moderate" but "less than extreme." *Id.* An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation may also seriously limit day-to-day functioning. *Id.*

If the child's impairment meets, medically equals, or functionally equals the Listing, and if the impairment satisfies the Act's duration requirement, then the child is considered disabled. 20 C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. 416.924(d)(2).

## B. The Administrative Law Judge's Findings

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on October 20, 1994. Therefore, he was an adolescent on August 30, 2006, the date the application was filed, and is currently an adolescent (20 C.F.R. 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since August 30, 2006, the application date (20 C.F.R. 416.924(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD)–combined type; opposition defiant disorder (ODD); asthma; and conductive hearing loss, status-post surgical intervention in January 2009 (20 C.F.R. 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.924, 416.925 and 416.926). The specific Medical Listings considered are Sections 103.03 and 112.11.

5. The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 C.F.R. 416.924(d) and 416.926a).

6. The claimant has not been disabled, as defined in the Social Security Act, since August 30, 2006, the date the application was filed (20 C.F.R. 416.924(a)).

(Tr. 14, 17, 24).

In determining that plaintiff's impairments were not functionally equivalent to a listed impairment, the ALJ found:

> 1. The claimant has less than marked limitation in acquiring and using information. (Tr. 19).
>
> 2. The claimant has less than marked limitation in attending and completing tasks. (Tr. 19).
>
> 3. The claimant has marked limitation in interacting and relating to others. (Tr. 20).
>
> 4. The claimant has no limitation in moving about and manipulating objects. (Tr. 21).
>
> 5. The claimant has less than marked limitation in the ability to care for himself. (Tr. 22).
>
> 6. The claimant has less than marked limitation in health and physical well-being. (Tr. 23).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004) (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

On appeal, plaintiff argues that: (1) the ALJ improperly assessed the severity of plaintiff's limitations in the domain of "acquiring and using information"; and (2) the ALJ improperly assessed the severity of plaintiff's limitations in the domain of "health and physical well-being."

**1. The ALJ's finding that plaintiff has less than marked limitations in the domain of "acquiring and using information" is not supported by substantial evidence.**

In determining that plaintiff has less than marked limitations in the domain of acquiring and using information, the ALJ stated:

> At the age of 12, claimant was placed in a 5th grade cognitive disability program. Intelligence testing at age 8 revealed a verbal IQ score of 73, a performance IQ score of 80, and a full scale score of 75-indicative of borderline intelligence (Exhibit IF). However, the evaluator thought those results could be an underestimate of claimant's true ability due to cultural/environmental and motivational factors. In fact, the test administrator stated that claimant's performance varied greatly on subtests (five of ten subtests were within the average range, and the other five were significantly below average range).

On intelligence testing in March 2007, claimant achieved a full scale score of 87-indicative of average intellect (Exhibit 8F). Also of note, the current and past year GAF at that time was reported to be 60-suggesting only moderate difficulty with respect to social or school functioning. After examining the claimant, Dr. Lester advised that he was performing at more than three-quarters of his age-appropriate level cognitively. More recently, on March 18, 2009, the Teacher Questionnaire completed by Ms. Lucas, who has been acquainted with claimant since August 2008, notes no significant difficulty in claimant's ability to follow instructions (Exhibit 14F). The preponderance of the objective medical evidence reflects that when the claimant is motivated and on task, he appears capable of average classroom performance.

(Tr. 19). Later in his decision, the ALJ generally concluded the following:

The undersigned has extensively reviewed the objective medical evidence in the record. Notably, the record as a whole is consistent with the assessments by consultative examiners Dr. Lester (Exhibit 8F), Haque, and Semmelman, PhD (Exhibit 9F), as well as with the school records and teachers' assessments at Exhibits 7E, 13F, and 14F. As indicated above, the preponderance of the evidence in these records is consistent with marked limitation for interacting and relating to others, but does not reflect the presence of marked limitations in any of the remaining domains of functioning. . . .

(Tr. 23).

Plaintiff contends the ALJ erred in determining that plaintiff has less than marked limitations in the domain of "acquiring and using information" because the ALJ misconstrued the evidence from Ms. Lucas, plaintiff's reading skills teacher, and failed to consider all the evidence pertinent to assessing the degree of limitation in this domain of functioning. The Court agrees.

### a. Evaluating children's SSI disability under the "whole child" approach

Functional equivalence to a listed impairment is evaluated using the "whole child" approach and requires consideration of "how the child functions every day and in all settings compared to other children the same age who do not have impairments." Social Security Ruling 09-1p. The "whole child" approach involves answering the following questions:

1. How does the child function?

2. Which domains are involved in performing the activities?

3. Could the child's medically determinable impairment(s) account for limitations in the child's activities?

4. To what degree does the impairment(s) limit the child's ability to function age-appropriately in each domain?

Social Security Ruling 09-1p.

This case involves the ALJ's answer to the fourth question as it relates to the domain of acquiring and using information. In assessing a child's degree of limitation in any given domain, Social Security Ruling 09-1p requires consideration of "how well the child can initiate, sustain, and complete activities, including the kind, extent, and frequency of help or adaptations the child needs, the effects of structured or supportive settings on the child's functioning, where the child has difficulties (at home, at school, and in the community), and all other factors that are relevant to the determination of the degree of limitation." SSR 09-1p (citing 20 C.F.R. § 416.924a). The degree of limitation–whether it is "marked" or "extreme"–is based on the answers to these questions:

1. How many of the child's activities in the domain are limited (for example, one, few, several, many, or all)?

2. How important are the limited activities to the child's age-appropriate functioning (for example, basic, marginally important, or essential)?

3. How frequently do the activities occur and how frequently are they limited (for example, daily, once a week, or only occasionally)?

4. Where do the limitations occur (for example, only at home or in all settings)?

5. What factors are involved in the limited activities (for example, does the child receive support from a person, medication, treatment, device, or structured/supportive setting)?

*Id.*

### b. Evaluating limitations under the domain of acquiring and using information

Under the domain of acquiring and using information, the ALJ must consider the child's ability to learn information and to think about and use the information. 20 C.F.R. § 416.926a(g). A child must "be able to use language to think about the world and to understand others and express [himself]; e.g., to follow directions, ask for information, or explain something." 20 C.F.R. § 416.926a(g)(1)(ii). School records provide important information in assessing limitations in the domain of acquiring and using information. SSR 09-3p. "Poor grades or inconsistent academic performance are among the more obvious indicators of a limitation in this domain provided they result from a medically determinable mental or physical impairment(s)." *Id.* School records may reveal that mental or physical impairments interfere with the child's ability to acquire and use information by showing the child receives:

> • <u>Special education services</u>, such as assignment of a personal aide who helps the child with classroom activities in a regular classroom, remedial or compensatory teaching methods for academic subjects, or placement in a self-contained classroom.

> • <u>Related services</u> to help the child benefit from special education, such as occupational, physical, or speech/language therapy, or psychological and counseling services.

> • <u>Other accommodations</u> made for the child's impairment(s), both inside and outside the classroom, such as front-row seating in the classroom, more time to take tests, having tests read to the student, or after-school tutoring.

> The kind, level, and frequency of special education, related services, or other accommodations a child receives can provide helpful information about the severity of the child's impairment(s).

SSR 09-3p. The ALJ must also "consider evidence about the child's ability to learn and think from medical and other non-medical sources (including the child, if the child is old enough to provide such information)" and limitations are assessed in all settings, not just in school. *Id.*

SSR 09–3p also provides examples of indicators of normal functioning of adolescents (age 12 to attainment of age 18) in the domain of acquiring and using information:

> • Continues to demonstrate learning in academic assignments (for example, in composition, during classroom discussion, and by school laboratory experiments).
>
> • Applies learning in daily situations without assistance (for example, going to the store, getting a book from the library, or using public transportation).
>
> • Comprehends and expresses simple and complex ideas using increasingly complex language in academic and daily living situations.
>
> • Learns to apply knowledge in practical ways that will help in employment (for example, carrying out instructions, completing a job application, or being interviewed by a potential employer).
>
> • Plans ahead for future activities.
>
> • Begins realistic occupational planning.

SSR 09–3p. *See also* 20 C.F.R. § 416.926a(g)(2)(v).

### c. Resolution

Plaintiff contends the ALJ misconstrued a 2009 report by his reading skills teacher, Ms. Lucas. The ALJ stated that Ms. Lucas reported that plaintiff had no significant difficulty in his ability to follow instructions. (Tr. 19). Plaintiff asserts that in response to the question "describe any difficulty in following instructions," Ms. Lucas actually reported that plaintiff "is often out of uniform (i.e., no belt, shirt untucked)." (Tr. 381). More importantly, Ms. Lucas reported a number of findings that, when read as a whole, lead to the conclusion that plaintiff in fact has difficulty following directions.

10

Plaintiff is correct that the ALJ erred in relaying Ms. Lucas' response to the request for information on plaintiff's ability to follow instructions. (Compare Tr. 381, with Tr. 19). In addition, the ALJ seemingly ignored other pertinent information contained within the Lucas Report that, when coupled with a longitudinal view of plaintiff's school performance (as explained below), indicates serious limitations of functioning in acquiring and using information. Ms. Lucas reported that plaintiff was not placed in a regular classroom but was in an "inclusion" program which means he was receiving special education instruction in the regular classroom. (Tr. 381, 131). Special classroom accommodations have been made for plaintiff within the school setting: He is given small group work; he is read to aloud; and he is given limited choices on multiple response questions or tasks. (Tr. 381). Plaintiff does not accept redirection readily, nor does he participate in class "without *immense* prompting." (Tr. 382) (emphasis added). All of these factors indicate serious limitations in acquiring and using information, yet the ALJ makes no mention of these factors in his decision when discussing Ms. Lucas' report. Given the ALJ's misrepresentation of Ms. Lucas' response to plaintiff's ability to follow instructions and the lack of any mention of the special education services plaintiff receives and difficulties he experiences within the classroom, the Court is unable to discern whether the ALJ actually considered Ms. Lucas' report in its entirety or ignored the portions reflecting that plaintiff's functioning was more limited than that found by the ALJ. *See* SSR 09-3p (highlighting the importance of special education services, related services, and other accommodations made for a child).

In assessing plaintiff's limitations in the domain of acquiring and using information, the ALJ appears to have focused on plaintiff's IQ scores which the ALJ believed showed plaintiff

11

functioned in the average range of intelligence and demonstrated less than marked limitations in this domain. (Tr. 19). The ALJ highlighted plaintiff's intelligence testing in 2003 and 2007 to conclude that plaintiff, when motivated and on task, "appears capable of average classroom performance." (Tr. 19). Yet, the whole child approach to functional equivalence requires a comparison of how the child is functioning in relationship to his or her peers. The ALJ's decision does not reflect any comparative analysis, nor does it acknowledge the serious deficiencies in plaintiff's ability to comprehend written language and his ability to write – two areas the Social Security Ruling on the relevant domain highlight as examples of limitations in the domain of acquiring and using information. *See* SSR 09-1p (examples of limitations considered in this domain include that the child is not reading, writing, or doing arithmetic at appropriate grade level; or has difficulty comprehending written or oral directions).

Absent from the ALJ's decision is a longitudinal view of plaintiff's functioning which shows that despite special education and related services, plaintiff is still significantly behind his peers in the relevant domain. Plaintiff was retained in kindergarten due to low academic skills. (Tr. 310). At the end of first grade, plaintiff scored a level 4 on the Developmental Reading Assessment in comparison with the goal of level 16 for first graders. (Tr. 310). His interventions during first grade included an individual chart for work completion, small group reading instruction, one to one assistance in the classroom, and use of visual aides and manipulatives. *Id.* He was promoted to second grade "with conditions" according to school records. *Id.*

Second grade testing in 2003, when plaintiff was 8 years and eleven months old, demonstrated that his basic reading skills were "significantly below grade level expectations."

(Tr. 178). Plaintiff scored a level 4 on the Developmental Reading Assessment in comparison with the goal of level 18 for second graders. (Tr. 177). He produced fewer total words than peers and attempted to sound out words but did not consistently connect letter and sounds. When writing numbers, he frequently reversed the numerals. (Tr. 178). His first and second grade teachers reported his adaptive behaviors to be "in the significantly below average range." (Tr. 180). His reading and writing skills tested at below age and below grade expectancies. (Tr. 181). The second grade evaluation team report indicated that plaintiff was "performing significantly below grade level expectations." (Tr. 184). He required adult assistance with all reading tasks and completed fewer classroom tasks than peers. (Tr. 184). He received numerous accommodations, including seating in the front of the room (near the speaker); daily intensive instruction in letter-sound association through increased opportunities to respond, modeling, immediate feedback, and goal setting; classroom modifications such as a reader for directions/questions/math problems; prioritized and shortened assignments; frequent teacher check-ins; an individual behavior plan; and speech therapy for articulation. (Tr. 310-11).

In the fourth grade, plaintiff was included in the regular classroom for all subjects, but received direct instruction from an intervention specialist for reading in the regular classroom. (Tr. 311). He had "a reduced grade-level spelling list and had access to in-class support for writing process, applications and conventions provided by special education staff. He also had support for morning work routines and content areas, primarily for behavior" and also "received occupational therapy services." *Id.* While at the time plaintiff demonstrated the capacity to follow school and classroom rules and directions on a consistent basis, sometimes even all five  days in a school week, he "could be either extremely well-behaved or very

13

disruptive (which was about 34% of the time). When disruptive, [he] was observed yelling, kicking chairs, and arguing - primarily when things were not going his way. He avoided work that required a written response or an active learning task on his part (e.g., read a selection, take a test or quiz, answer comprehension questions)." *Id.* While he sometimes completed written work, it was not within the expected time frame allotted. *Id.* His ability to follow classroom rules, complete work, and remain in the classroom were inconsistent (varying from 45% to 88% of the time) and his "academic performance could be largely influenced by his behavior" as he "fled the classroom 64% of the time that a written response was required of him." *Id.* He was more successful in structured environments and when material was presented orally and a scribe was accessible. *Id.*

In October 2006, when he was in the fifth grade, plaintiff continued to receive special education services daily for 30 hours per week. (Tr. 131). His Intervention Specialist reported that plaintiff was reading at the third grade level, performed math at the fourth grade level, and performed written language at the 3.5 grade level. (Tr. 133). He received daily special education services through an "inclusion classroom with [a] special ed teacher all day." (Tr. 133). His "weekly assessments [were] read to him and his responses [were] scribed for him." (Tr. 134).

In 2009, when he was in the seventh grade, plaintiff scored at the third to fourth grade level on the Brigance Reading Test, and he scored at the third grade level on the Slosson Oral Reading test. (Tr. 351). Because plaintiff repeated kindergarten, he was actually reading and writing at four to five grade levels below his peers. (Tr. 177). He achieved grades of "F" in reading (despite being in a reading intervention class), a "C" in language arts, a "D" in math (even with assistance and modified tests), a "C" in science, and an "F" in social studies (even

14

with tests read to him with modifications). He received special education support for all

academics due to a "significant deficiency" in reading and written comprehension. (Tr. 353,

354). The record evidence demonstrates that through at least the last four years, plaintiff has not

been able to improve his ability to read and write. (Tr. 133, 178, 351). While the ALJ states he

considered school records and teachers' assessments (Tr. 23, citing Exhibits 7E, 13F, and 14F),

the ALJ does not mention the findings in Exhibit 6F (Evaluation Team Report) or Exhibit 11F

(7/8 grade Individualized Education Plan) which indicate serious deficits in plaintiff's ability to

understand and communicate the meaning of written language.

     The Commissioner nevertheless argues that the ALJ reasonably determined that plaintiff

had less than marked limitations in acquiring and using information, pointing to the Intervention

Specialists' ratings for acquiring and using information. The Specialist reported "an obvious

problem" in four areas and a "slight problem" in six areas of functioning and did not rate plaintiff

with a "serious problem" or "very serious problem" in any area. (Tr. 134). Yet, "[f]or a child to

have a marked or extreme limitation in a particular domain, not all activities or functions

encompassed by the domain need be impaired. For instance, a twelve-year old child could have a

marked or extreme limitation in the domain of acquiring and using information if he had a

serious learning disability which had prevented him from learning to read and write even though

he was of normal intelligence and had good verbal communication skills." *McClain v. Barnhart*,

299 F. Supp.2d 309, 315 (S.D.N.Y. 2004) (citing *Quinones v. Chater*, 117 F.3d 29, 31-32, 36 (2d

Cir. 1997)); *see also* 20 C.F.R. § 416.92a(e)(2)(i). "Alternatively, when a child suffers from

multiple impairments within a single domain, each of which, when considered separately,

imposes a less-than-marked limitation, the combined result nonetheless may be marked or

15

extreme." *Id.* (citing *Encarnacion v. Barnhart*, 191 F. Supp.2d 463, 474 (S.D.N.Y. 2002)). *See also F.M. v. Astrue*, No. 08-cv-4430, 2009 WL 2242134, at \*10 (E.D.N.Y. July 27, 2009) (limitations of "slight" problems in four areas and "obvious" problems in six areas, including learning new material and applying problem-solving skills in class discussions, taken together, are consistent with and support a finding that child suffers a marked limitation in domain of acquiring and using information). Here, plaintiff had "obvious" problems with reading and comprehending written materials; providing organized oral explanations and adequate descriptions; expressing ideas in written form; and recalling and applying previously learned material. (Tr. 134). When viewed in the context of the record as a whole, along with the special education and supportive services plaintiff received over the years, these problems strongly suggest marked limitations in the relevant domain.

The Commissioner also points to the opinions of the state agency doctors who concluded that plaintiff had less than marked limitations in acquiring and using information. (Doc. 12 at 7, citing Tr. 333-39). Yet, these non-examining doctors based their opinions on plaintiff's IQ testing (Tr. 336) and were without all of the medical evidence in the record, including the assessments from 2009 which showed that plaintiff continued to be four to five grade levels behind his peers in reading. Therefore, these non-examiners' opinions were not based on a complete record and do not provide substantial evidence for the ALJ's opinion. *See Blakley*, 581 F.3d at 409 ("we require some indication that the ALJ at least considered these facts before giving greater weight to an opinion that is not based on a review of a complete case record"). *See also Shelman*, 821 F.2d at 321; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

Finally, while the ALJ noted that Dr. Lester opined that plaintiff was functioning at more than three-quarters of his age-appropriate level cognitively (Tr. 19, 331), the ALJ failed to consider Dr. Lester's findings in the context of the other evidence of record showing significant delays in reading and writing over the long term. *See* Social Security Ruling 09-1p (noting the limitations inherent in a one-time consultative examination in assessing the limitations of functioning in a given domain). Plaintiff's cognitive functioning at a single consultative examination says little about his ability to acquire and use information from a longitudinal standpoint – unlike the school records contained in the instant record which show that despite below average to average intellectual functioning, plaintiff's other severe mental impairments significantly inhibit his ability to acquire and use information.

The ALJ's decision does not acknowledge the serious problems plaintiff has with written language. The ALJ focused on plaintiff's IQ scores without considering the difficulties plaintiff has had with reading and with the written aspects of communication, despite his receipt of special education assistance (having assignments and tests read to him, the services of a scribe, limited choices for multiple response questions, small group instruction, one to one assistance in the classroom), and other supportive services and accommodations. The ALJ's decision reflects no recognition whatsoever of the special education services and accommodations plaintiff has received throughout his school years or his consistently significant delays in reading. The Social Security Regulations provide that "good performance in a special education setting does not mean that [a child is] functioning at the same level as other children [his] age who do not have impairments." 20 C.F.R. § 416.924a(b)(7)(iv). Plaintiff's lack of achievement in school despite daily special education and intervention services simply highlights the limitations in his

17

functioning vis-a-vis his peers without impairments. *Cf. F.M.,* 2009 WL 2242134, at *9 (fact

that child was "the beneficiary of the devoted efforts of special education teachers and therapists,

whose labors have enabled [him] to make improvements in his skills . . . is insufficient to support

a finding that [child's] functional limitations are not marked."). The Court is unable to discern if

the ALJ overlooked these accommodations and deficits or simply ignored them in assessing

plaintiff's limitations in the domain of acquiring and using information. Because the ALJ failed

to articulate any reasons for discounting these factors in his decision, the Court is unable to

conclude that the ALJ's finding that plaintiff has less than marked limitations in acquiring and

using information is supported by substantial evidence. Therefore, plaintiff's first assignment of

error should be sustained.

### 2. The ALJ's finding that plaintiff has less than marked limitations in the domain of health and physical well-being is supported by substantial evidence.

The ALJ determined that plaintiff has less than marked limitations in health and physical

well-being, reasoning as follows:

> The claimant has a history of asthma. In September 2005, claimant was hospitalized and intubated after an asthma exacerbation. However, since that incident, there is no indication that he has required any frequent emergency medical treatment or hospitalizations due to extensive asthmatic exacerbations. The claimant has been prescribed Flovent, Singulair, Albuterol, and Allegra. The record reflects that his asthma condition has remained relatively well controlled with medication. Further, physical examinations have been within normal limits. Claimant also has a history of ear infections and has had multiple PE tubes. However, again, the medical records show that his condition has been stabilized with surgical intervention and has resulted in improved hearing and overall ear function. The claimant takes medication for ADHD and asthma, but the record does not document any significant side effects from medication. The record supports a finding that the claimant has less than marked limitation in the area of health and physical well-being.

(Tr. 23).

Plaintiff takes issue with the ALJ's finding that plaintiff's hearing impairment has been stabilized by surgery and has resulted in improved hearing and overall ear function. Plaintiff contends his medical history, including recurrent ear infections, nine surgeries, and progressive conductive hearing loss, creates serious limitations in the relevant domain of health and physical well-being.

The Commissioner responds that "simply having eardrum perforations, ear aches, and tubes inserted into one's ears as a child is not uncommon, and is not akin to dramatic hearing loss, where one may need to wear hearing aids, learn sign language, or learn to read lips." (Doc. 12 at 8). The Commissioner also notes that none of plaintiff's teachers referenced his hearing issues in their questionnaires. (Doc. 12 at 8, citing Tr. 131-40, 381-84).

The health and physical well-being domain considers the cumulative physical effects of physical and mental impairments and their associated treatments on a child's health and functioning. *See* Social Security Ruling 09-8p. This domain addresses the effect of recurrent illness, the side effects of medication, and the effect of the need for ongoing treatment on the child's body. *Id.*

In this case, plaintiff has had nine surgeries on his ears, including eight for placement of tympanostomy tubes in the ears (Aug. 1999, June 2000, Nov. 2000, Oct. 2002, Oct. 2003, Aug. 2004, Jan. 2005, Dec. 2007) (Tr. 269, 301, 392-93) and one surgery to repair a left perforated eardrum. (Tr. 345). Audiograms show variations in plaintiff's hearing loss, not progressive hearing loss. *Compare* Tr. 265 (Sept. 2003–mild bilateral hearing loss at higher frequencies); Tr. 403 (August 2007– moderate conductive hearing loss on right, mild to moderate conductive hearing loss on left); Tr. 400 (September 2007–marked low tone conductive hearing loss on left

19

consistent with eardrum perforation, and right conductive low tone hearing loss, not as severe as left); Tr. 395 (Oct. 2007–"greatly improved" hearing on right after resolution of otorrhea); Tr. 386 (March 2008–improvement in the left ear, but fairly significant low tone conductive hearing loss in left ear consistent with ossicular fixation); Tr. 344 (Sept. 2008–normal to mild conductive hearing loss bilateral); Tr. 343 (Dec. 2008–mild conductive hearing loss right ear, and mild to moderately severe conductive hearing loss left ear). Although plaintiff asserts that at least one physician has recommended hearing aids which plaintiff has been unable to afford (Tr. 64), the record before the Court does not reflect any such recommendations by a physician. Nor has plaintiff pointed to evidence demonstrating a connection between plaintiff's variable hearing loss and limitations in any other domains of functioning. Plaintiff's IEP's have recommended he be seated near the teacher to accommodate his hearing loss, but none of plaintiff's teachers have opined that his hearing loss has impacted his ability to learn or interact with his peers. Nor have his teachers opined that plaintiff's absences from school as a result of doctors' appointments or surgeries were of such a frequency as to interfere with his ability to learn and interact with others. The ALJ's finding of less than marked limitations in the domain of health and physical well-being is substantially supported by the record. Plaintiff's second assignment of error should be overruled.[1]

---

[1]In his reply brief, plaintiff argues that asthma is another factor which has seriously impacted this domain of functioning. However, plaintiff did not raise this issue in his Statement of Errors and may not raise new issues for the first time in his reply brief. *See Wright v. Holbrook,* 794 F.2d 1152, 1156 (6th Cir. 1986). *See also Bishop v. Oakstone Academy,* 477 F. Supp.2d 876, 889 (S.D. Ohio 2007) ("[I]t is well established that a moving party may not raise new issues for the first time in its reply brief."). The Court therefore declines to review any new claims of error raised in plaintiff's reply brief.

**IV. This matter should be reversed and remanded for further proceedings.**

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of his alleged onset date. *Faucher*, 17 F.3d at 176. On remand, the ALJ should properly evaluate the special education services and accommodations plaintiff has received throughout his school years, as well as his consistently significant delays in reading and writing on his ability to function in the domain of acquiring and using information.

## IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: 1/23/12

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

REBECCA FAGIN,
O/B/O/ B.P.,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:10-cv-813
Dlott, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).